# In the Matter of:

*Vivian Patz and Michael Patz*

*vs.*

*Sureway Supermarket, Walter H. Maples, Inc., et al*

## Vivian Patz

July 10, 2018



504-833-3330
www.currenland.com



EXHIBIT 3

```
 1   with Met Life; is that correct?
 2       A.   That's my dental.
 3       Q.   That's your dental?
 4       A.   Okay.  Correct.
 5       Q.   Okay.  Just need to clarify that.  All
 6   right.  But do you have insurance through -- you
 7   have the insurance through Achess?  Is that what
 8   you --
 9       A.   Not currently.
10       Q.   Not currently?
11       A.   Correct.
12       Q.   Okay.  Do you have health insurance at
13   this time?
14       A.   No, not at this time.
15       Q.   Okay.  All right.  Have you ever been
16   under the care of a doctor or a therapist?
17       A.   I'm sorry.  I don't know what you mean
18   by care, under the care.
19       Q.   Do you have any sort of chronic
20   illnesses or medical conditions?
21       A.   Not that I know of.
22       Q.   Okay.  And I think you said that you
23   were not currently taking any medications?
24       A.   Correct.
25       Q.   Okay.  Let me ask you.  Have you ever
```

```
 1        Q.  Okay.  Anything else?
 2        A.  I think that's all throughout this
 3   pregnancy.
 4        Q.  Okay.  Was your daughter premature?
 5   Was she born premature?
 6        A.  No, ma'am.  There was complications at
 7   birth, though.
 8        Q.  Okay.  And what were they?
 9        A.  She had the cord around her neck, and
10   when she was born, she was very dark.  And all I
11   could remember is that they patted her on the
12   back, just, "Come on, come on," saying that kind
13   of stuff.  So it took me a long time to realize
14   that she was probably dead when she was born or
15   not taking in that first breath.
16        Q.  How much did she weigh?
17        A.  She weighed six pounds, 13 ounces.
18        Q.  Okay.  I'm just curious because my kids
19   were -- my daughter was eight pounds,
20   three-and-a-half ounces, and my son was nine
21   pounds, three-and-a-half ounces.
22        A.  Oh, wow.  Big babies.
23        Q.  He continues to grow.  He is 15 and
24   six, six and 300 pounds.  So --
25        A.  They can do that.
```

```
 1        Q.  Okay.  Has your daughter continued to
 2   -- has she suffered any additional complications
 3   because of this?
 4        A.  I don't think so, no.
 5        Q.  Does she have any medical conditions?
 6        A.  Unh-unh, no.
 7        Q.  All right.  Let me ask you something
 8   about the lead disclosure.  I understand you
 9   believe that Shelly and Sureway and all of them
10   were supposed to disclose to you the possibility
11   of lead-based hazards.
12   MR. MOST:
13               Objection, calls for a legal
14        conclusion.
15   EXAMINATION BY MS. LAMBERT:
16        Q.  When did you learn that you were
17   supposed to be informed or advised of this
18   information?
19        A.  I'm sorry.  I don't understand.  When
20   was I told about?
21        Q.  Yes.  When were you told?
22   MR. MOST:
23               Objection.  Also, calls for on the
24        basis of attorney/client privilege.
25   EXAMINATION BY MS. LAMBERT:
```

```
 1        Q.   So --
 2        A.   Do I answer?
 3   MR. MOST:
 4             You can answer.
 5   MS. LAMBERT:
 6             Yes.
 7   THE WITNESS:
 8             I found out about that whenever
 9        all this started.
10   EXAMINATION BY MS. LAMBERT:
11        Q.   So you did not know anything about that
12   until after you consulted an attorney?
13        A.   Correct.
14        Q.   Have you ever received any kind of
15   information from any of your landlords like that
16   about lead-based hazards?
17        A.   Yes.  Whenever we -- like when we moved
18   into our apartment for Arizona, through our
19   lease we had paperwork that we had to sign.
20        Q.   Okay.  What about the trailer?
21        A.   No, they didn't have us sign there or
22   told us anything.
23        Q.   Okay.  So tell me if I am correct that
24   you didn't leave the property, the Nacari Lane
25   property, because you weren't informed of the
```

```
 1   potential of lead-based paint, lead-based
 2   hazards?
 3       A.   I'm sorry.  I didn't understand.
 4       Q.   The failure to provide you with this
 5   information about possible lead hazards, had no
 6   role in your leaving the apartment?
 7       A.   Uh-huh.
 8       Q.   Is that correct?
 9       A.   Correct.
10       Q.   What damages have you sustained as a
11   result of that failure --
12       MR. MOST:
13               Objection, calls for a -- I'm
14       sorry.  You can finish.
15   EXAMINATION BY MS. LAMBERT:
16       Q.   What damages have you suffered as a
17   result of the failure to provide you with that
18   disclosure?
19       MR. MOST:
20               Objection, calls for a legal
21       conclusion.
22       THE WITNESS:
23               I'm not sure.
24   EXAMINATION BY MS. LAMBERT:
25       Q.   Okay.  So you've never had a doctor
```

```
 1   tell you that you have suffered any sort of
 2   physical ailment?
 3        A.   No, not that I know of.
 4        Q.   Have you ever sought any sort of mental
 5   health?
 6        A.   No, ma'am.
 7        Q.   Okay.  Did you have a bank account when
 8   you lived in Grand Isle?
 9        A.   Yes, ma'am.
10        Q.   You did.  Okay.  What bank was that
11   with?
12        A.   USAA.
13        Q.   USAA.  Okay.  Did they have a local
14   branch?
15        A.   No, ma'am.
16        Q.   Where would you -- where was the
17   closest USAA?
18        A.   I honestly don't know.
19        Q.   Okay.
20        A.   I believe Texas for the branch.
21        Q.   Okay.  Well, what services did you
22   have, or did you have a checking account with
23   them?
24        A.   Yes, ma'am, I had a checking, and I had
25   a savings.
```